UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – x
                                            :

BEEP, INC.,                                 :
                                            :

                Plaintiff,           :
                                            :     Case No. 1:25-cv-07626

      -against-                   :
                                            :     **COMPLAINT**
                                            :

BENTELER TRADING INTERNATIONAL AG    :     **JURY TRIAL DEMANDED**
AND CAB HOLDING GMBH,             :
                                            :

                Defendants.       :
– – – – – – – – – – – – – – – – – – – – – – – – – – – x

      Plaintiff Beep, Inc. ("Plaintiff" or "Beep"), by and through its undersigned counsel, hereby submits this complaint for breach of contract and breach of the implied covenant of good faith and fair dealing against Defendants Benteler Trading International AG ("BTI") and CAB Holding GmbH ("CAB" and, together with BTI, "Defendants") based on the following allegations:

## PRELIMINARY STATEMENT

      1.     This action arises from an under-handed scheme directed by companies controlled by the heir-apparent to the centuries-old Benteler family-fortune, Casper Alexander Benteler. Enmeshed in a family feud over billions in assets, Casper found himself without family support, short of liquidity and in desperate need of financial backers and partners to develop and test the United States market for autonomous electric vehicles ("AEVs") to be manufactured by his Germany-based company, Holon Motors GmbH ("Holon Motors").

      2.     To solve his problems, Casper first turned to Beep, an innovative, United States-based technology company that invented critical software to be integrated within Holon Motors' AEVs.  Beep agreed to collaborate with Casper to develop Holon Motors' AEVs and attract

additional investors. Toward that end, Beep executed an Alliance Agreement ("Alliance Agreement") with Casper-controlled BTI.

3.    The Alliance Agreement embodied Beep's commitment to bring Holon Motors' AEVs to the United States market by advancing BTI $30 million to fund, establish, and rollout Holon Motors' United States business. Beep also provided critical software to the AEVs, spearheaded the effort to obtain United States regulatory approval for the AEVs, and served as the preferred seller of the first 1,000 AEVs in the United States. In exchange, BTI agreed to bring Holon Motors' manufacturing to the United States, to refrain from marketing, selling or leasing any Holon Movers in the United States independently of Beep, to meet a series of development and manufacturing milestones, and to honor its other contractual obligations to Beep.

4.    In order to ensure that its $30 million was properly invested and secured, Beep required the ultra-wealthy Casper to personally guarantee that he would pay back the $30 million to Beep if BTI did not meet its business obligations. Casper agreed and signed a personal guarantee.

5.    Casper subsequently approached Beep and claimed that he was close to closing a "sweetheart" deal with his sister and cousins that would solve his liquidity problems and permit him to attract additional investors to the Holon Motors' AEV project. Casper asked Beep if CAB (an entity Casper formed and controlled) could step into his shoes to guarantee BTI's obligation to pay back the $30 million to Beep. Beep agreed and executed the Guarantee Agreement with CAB (the "Guarantee Agreement").

6.    Over time, Beep came to realize that Casper was not acting in good faith. Rather, Casper has treated Beep's $30 million investment as an interest-free personal loan. Upon

information and belief, Casper never used a penny of Beep's investment to establish and rollout Holon's United States business.

7.     Rather, Casper and the Defendants watched while Beep tested and developed a United States market for Holon Motors' AEVs, spent significant resources in the effort to obtain United States regulatory approval for the Holon Motors' AEVs, built a marketing strategy to sell Holon Motors' AEVs to United States buyers, and collected deposits from customers who were willing to purchase the Holon Motors' AEVs as soon as they were road-ready.

8.     All the while Casper and the Defendants plotted to betray Beep.  They worked behind Beep's back to cut it out of the Holon Motors project entirely.  Collectively, they ignored or missed numerous development and manufacturing deadlines that delayed the project, they engaged in marketing efforts and entered into agreements with buyers in the United States without Beep, they removed Beep from marketing materials, they declined to enter into a licensing agreement for Beep's software, and they refused to properly invest Beep's $30 million.

9.     When Beep exercised its rights under the Agreements to reclaim its $30 million because of the Defendants' breaches, they stonewalled.  It became very clear that the Defendants had no intent to collaborate with Beep, had abandoned their intent to manufacture Holon Motors' AEVs in the United States, had stopped trying to make meaningful progress to test the Holon Motors' AEVs and had no plan to meet production timeline milestones set forth in the Alliance Agreement.

10.     In reality, Casper and the Defendants never had any intention to live up to its end of the bargain.  They were just using Beep for its $30 million, its ability to develop the United States market, its efforts to obtain United States regulatory approval, and its presence in the United States to gain a foothold in this country.  When confronted with their failures, Casper and the

Defendants hired a high-powered law firm to recite phony and unsupported reasons for their failures and breaches. All the while, they worked to replace Beep with another Casper-controlled entity called Benteler Mobility of Germany.

11.    Beep can no longer allow its $30 investment to further Casper and the Defendants' fake commitment to the United States. Consequently, Beep filed this lawsuit to hold the Defendants accountable for the harm they have caused by seeking the return of its $30 million, plus other damages.

**<u>PARTIES</u>**

**A.  Beep**

12.    Plaintiff Beep is a Delaware corporation with its principal place of business located at 13485 Veterans Way, Suite 110, Orlando, Florida 32827.

13.    Beep specializes in the deployment, operations and management of autonomous vehicles for its customers. Beep has also developed software solutions that enable the safe, efficient, and scalable operation of AEVs, particularly in shared mobility and public transit settings. Beep's AutonomOS software is a comprehensive suite that enhances the basic self-driving capabilities provided by automated driving systems within the AEVs. It empowers transit authorities, fleet managers, and AEV operators to plan, monitor, and manage operations of their AEV fleets with a high degree of oversight and control. By integrating real-time vehicle telemetry, smart city infrastructure, and advanced AI-driven in-cabin monitoring, Beep ensures that AEVs are not only operationally efficient but also prioritize passenger safety and service reliability.

14.    Through the AutonomOS software and its other solutions, Beep delivers the critical infrastructure and intelligent tools necessary for the successful deployment and management of AEVs at scale. The Beep software and solutions fill the operational gaps left by AEV

manufacturers and automated driving systems, ensuring that autonomous transit is not only technologically feasible but also safe, accountable, and responsive to the needs of both operators and passengers.

**B. BTI and CAB**

15.     Defendant BTI is a stock corporation (Aktiengesellschaft) incorporated under the laws of Switzerland with a principal place of business at Baarerstrasse 131, 6300 Zug, Switzerland.

16.     BTI markets itself as a "inventory ownership company" that "buy[s], hold[s] and sell[s] inventory" for the purpose of "delay[ing] asset recognition and payment until companies need goods."[1]

17.     Defendant CAB is a limited liability company under the laws of Liechtenstein with its registered office located at Herrengasse 21, 9490 Vaduz, Principality of Liechtenstein. It is registered in the Commercial Register of the Principality of Liechtenstein under registration number FL-0002.713.914-0.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the parties are diverse and the amount in controversy exceeds $75,000.

19.     Personal jurisdiction and venue are properly laid because Defendants have consented to being sued in a state or federal court in New York County, New York.

20.     Section 16 of the Alliance Agreement specifies that "[a]ny dispute arising under this Agreement shall be brought in a state or federal court in New York County, New York."

21.     Section 6.10(a) of the Guarantee Agreement provides that:

> Each party hereto hereby irrevocably and unconditionally submits, for itself and its property to the nonexclusive jurisdiction of any New York state court or federal court of the United States sitting in New York County, New York, and any

---

[1] https://benteler-trading.com/#:~:text=About%20us,more%20value%20to%20our%20clients.

appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, hereby irrevocably and unconditionally agrees that, to the extent permitted by applicable law, claims in respect of any such action or proceeding may be heard and determined in such state or, to the extent permitted by applicable law, in such federal court.

22.     Section 6.10(b) of the Guarantee Agreement provides that:

Each party hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section 6.10 and further irrevocably waives, to the fullest extent permitted by law the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

## FACTUAL ALLEGATIONS

### A.     Casper Seeks Control of Benteler and a Partner to Test the United States AEV Market

23.      BTI is part of a multi-billion Austrian conglomerate owned by Benteler Group. BIAG owns 100% of the shares in Benteler Group.  BIAG was previously owned by Dr. Ing E.h. Helmut Benteler and his brother Hubertus Benteler, Casper's father, who both inherited the fortune and control of the Benteler empire in the 1980s.

24.     Upon information and belief, BIAG is currently owned 50% by Dr. Helmut Benteler and 50% by Hubertus Benteler's son, Casper, through CAB.

25.     Upon information and belief, Casper is in the process of seeking majority control of BIAG.  He intends to do so by buying out other heirs, including his sister and cousins, which would deliver him exclusive control over the Benteler conglomerate of companies.

26.     In 2022, Casper decided he would prove his merit in the burgeoning AEV market in the United States.  As part of the effort, Casper established Holon U.S., Inc. ("Holon US") to sell the "Holon Mover"—an AEV for driverless transportation—in the United States.  Holon US is majority-owned by the Benteler Group.

27.     But simply setting up new companies was not enough.  Casper lacked the technical experience required to develop AEV technology and had no familiarity with the complex regulatory landscape governing their deployment.  He was unprepared to navigate the legal permitting process necessary to manufacture and sell AEVs in the United States, and he had no relationships or understanding of the United States' customer base.  With increasingly stringent Buy American requirements, securing a credible American partner was essential to any realistic path forward.

### B.     Casper Convinces Beep to Form an "Alliance"

28.     Through years of ingenuity and hard work, Beep had deployed, managed and operated multi-passenger AEVs in over 40 pilot projects across 9-states that provided safe and reliable autonomous solutions for private and public transportation authorities that reduced congestion, improved the environment, and delivered on transportation equity and access.

29.     Before its introduction to Casper, Beep had already established itself as the leader in deploying autonomous technology solutions across the United States.  Its customer base included forward-thinking municipalities, transit agencies, and private operators who viewed autonomous shuttles not merely as pilot projects, but as foundational elements of broader, long-term transportation strategies. These potential buyers—ranging from smart city planners to university campuses and airport authorities—recognized Beep's technology as scalable and adaptable to complex environments. They valued Beep's operational expertise, commitment to safety, and ability to integrate seamlessly with existing infrastructure, making them strong candidates for multi-vehicle deployments, route expansions, and enduring partnerships. To that end, Beep had already launched multiple pilot public transportation programs in Jacksonville,

Florida, Newark Airport in New Jersey, the Lake Nona region in Orlando, Florida, the University of North Carolina-Charlotte, Atlanta, Georgia, and Contra Costa, California.

30.     Through the years, Beep gained a deep understanding of the United States regulatory system and developed relationships with key government agencies and officials responsible for safely introducing AEVs to United States roadways.  As a result, Beep earned credibility with the regulators and designed a process to obtain the required permissions to operate AEVs.  This knowledge did not come quickly or cheaply.  Beep spent countless hours and millions of dollars of its own money over six years to develop its understanding of the applicable federal, state and local regulatory, legislative and legal requirements.  As a result of these efforts, Beep was well-positioned to effectively communicate and work with federal regulatory agencies and state and local governments to obtain the necessary permits and waivers to operate AEVs on public roads.

31.     Importantly, Beep's AutonomOS software provides critical infrastructure and intelligence tools necessary to meet applicable safety requirements of the United States Department of Transportation ("DOT") and the National Highway Traffic Safety Administration ("NHTSA").

32.     Indeed, Beep has received and managed dozens of waivers to operate AEVs that require a permission letter from the NHTSA for the testing of AEVs that do not meet United States Federal Motor Vehicle Safety Standards ("FMVSS").  Purpose-built AEVs, such as the proposed Holon Movers, do not satisfy FMVSS requirements because they, among other things, do not utilize a steering wheel and standard brake systems, require a waiver or exemption from NHTSA under Part 555 to deploy the AEVs on United States roadways.  Upon information and belief, Beep has received more waivers for AEVs than any other company.

33.     Without Beep's regulatory experience and active engagement with NHTSA, the DOT, and elected officials, Casper and his companies were not capable of receiving the necessary exemptions to operate Holon Movers on public roads in the United States. Nor could they without, at the very least, spending millions of dollars over many years to establish credibility and understand how the United States regulatory and legislative processes work. So, Casper and the Defendants needed Beep.

34.     In or about 2021, Beep initially engaged with Benteler Automotive, the predecessor to Holon Motors, to discuss the development of the Holon Movers. Beep's interactions with Benteler Automotive were positive and trust was established between the companies. A trust that began to evaporate when Casper became directly involved with Beep in or about 2023.

35.     In an attempt to convince Beep to deepen its relationship with the Benteler companies, Casper proposed an "alliance" that would enable Beep to embed its software into the Holon Movers and provide access to Beep's valuable customer relationships. Casper offered Beep the preferred right to sell the first 1,000 Holon Movers in the United States and earn revenue from the financing obtained by purchasers of the Holon Movers. And he committed that Benteler would not propose any Holon Movers for sale or lease in the United States without Beep. In return, however, Casper and his affiliated companies required Beep's financial support to bring the product to market and launch Holon in the United States. And they needed Beep's reputation and track record of earning regulatory approval to establish credibility with United States customers.

36.     For starters, Casper informed Beep that he needed $30 million to establish a United States manufacturing presence for the Holon Movers and to attract a substantial investment in Holon Motors from Tasaru Mobility Investments from Saudi Arabia ("Tasaru"). Even though he is ultra-wealthy, Casper explained that his family squabbles rendered him short of cash, so he

needed $30 million from Beep. If he had that $30 million, Casper explained, he could receive more favorable terms for the Tasaru's investment in Holon Motors.

37.     Casper represented that, armed with both investments, the Defendants would partner with Beep to manufacture and sell the Holon Mover in the United States. In order to do so, however, Casper and the Defendants also needed Beep's help navigating the United States regulatory system, with which they had no experience and for which they needed a United States-based partner.

38.     In return, Beep was to receive the right of first refusal to sell all Holon Movers produced or used in the United States, and to integrate and use Beep's AutonomOS software on the Holon Movers for deployment in the US and in Saudi Arabia for which Beep would be compensated under a separate licensing agreement.

39.     Living up to its contractual obligations, Beep delivered $30 million to BTI in early 2024.

40.     Upon information and belief, Beep's $30 million investment never made it to Holon.

41.     In or around February 2024, Casper attended a business dinner in New York City with Beep's executives.

42.     During that dinner, Casper bragged that he was able to secure a "sweetheart" deal to buy-out his sister and cousins, which would deliver him exclusive control over the Benteler enterprise and Holon Mover project.

43.     But, in order to close the "sweetheart" deal, Casper claimed that he needed relief from the personal guarantee he had signed to secure the $30 million that Beep had sent to BTI. In

his place, Casper offered CAB Holding GmbH, an entity that he controlled which was well capitalized through its 50% ownership of BIAG.

44.    But this was all a deception.  In reality, Casper planned to seize control of the family empire and then build the "Benteler Mobility" brand to replace Beep's role in the supposedly collaborative effort to develop, manufacture and sell Holon Movers in the United States.  But only after Casper and the Defendants misused Beep's $30 million and unjustly benefited from its marketing, sales, customer base, and regulatory efforts.

### 1.    *The Alliance Fee Letter*

45.    On or about December 29, 2023, Beep and BTI entered into the Alliance Fee Letter ("AFL").

46.    In Section 9(B) of the AFL, BTI represented that it had all requisite power and authority to carry on its businesses as now conducted and proposed to be conducted, and to enter into the AFL and to perform the terms of the AFL.

47.    In the AFL, BTI represented that Holon US would develop the Holon Mover and that it would be manufactured and assembled in the United States.

48.    BTI represented that it had formed a new entity to be the distributor of Holon Movers, BTI EV Distribution LLC ("AssetCo") and, pursuant to the terms of the AFL, it would use Beep to market, sell, lease, deploy, operate and manage Holon Movers in the United States.

49.    BTI agreed to use its best commercial efforts to ensure that the newly formed entity, AssetCo, would negotiate an alliance agreement governing its relationship with Beep and Holon US to market, sell, deploy and operate Holon Movers in the United States.

50.    In exchange for BTI's agreement to the terms of the AFL, Beep paid BTI $30 million (the "Alliance Fee").

51.     Casper represented that the Alliance Fee would be used to fund early prototypes and would be paid back to Beep as the collaborative generated revenue (the "Sales Channel Fee") on the first 1,000 Holon Movers sold in the United States.

52.     The AFL provided that if BTI failed to procure the performance by Holon US of, or Holon US failed to perform, one or more of the undertakings set forth in Section 7.2 of the AFL, BTI shall pay Beep $30 million less any Sales Channel Fees paid to it and any losses incurred by Beep.

### 2.     The Alliance Agreement

53.     On or about August 22, 2024, Beep and BTI entered into the Alliance Agreement contemplated by the AFL.

54.     Pursuant to the terms of the Alliance Agreement, the AFL was terminated and replaced with the Alliance Agreement.

55.     BTI again represented in the Alliance Agreement that the agreement between BTI and Holon US would require Holon US to make the specific commitments for the development, manufacturing, marketing, and deployment of the Holon Mover in the United States as set forth in the Alliance Agreement.

56.     The Alliance Agreement granted Beep the right to market, operate and provide managed services for the Holon Movers to Prospective Clients and Clients in the United States.

57.     In the Alliance Agreement, BTI represented that as of the Effective Date of the Alliance Agreement, Holon US had committed to develop the Holon Mover and meet the applicable Availability Dates to deliver test vehicles to Beep as set forth in the Alliance Agreement.

58.     In Section 3(A) of the Alliance Agreement, BTI represented that Holon US would make available Holon Movers to Beep by certain dates.

59.     In Section 3(B) of the Alliance Agreement, BTI represented that:

(a) Holon has, as of August 8, 2024, agreed to locate a manufacturing facility for the Holon Mover in Jacksonville, Florida (the "Assembly Site") and shall no later than November 8, 2024 purchase or lease land or purchase or lease an existing manufacturing plant including to commence procurement of requisite manufacturing equipment, for the development of the manufacturing facility); and (b) Holon has agreed to achieve SOP of Holon Movers at the Assembly Site, (i) on or prior to October 1, 2026 and/or (ii) including FMVSS compliance and testing, on or prior to February 28, 2027 ("FMVSS SOP"), unless, in each case, the delay is due to a Benteler Excused Performance.

60.     A "Benteler Excused Performance" is defined in Section 1 of the Alliance Agreement as:

a cause beyond the reasonable control of Holon, such as, without limitation, force majeure event, extensive supply chain impacts to a critical component of the Holon Mover that Holon could not have reasonably foreseen, applicable regulatory approvals and inability to obtain necessary financing through commercial lenders due to a downturn in economic markets and conditions, and not mere inconvenience.

61.     Section 2(F) of the Alliance Agreement requires that BTI promptly notify Beep in the event of a "Benteler Excused Performance."

62.     In Section 3(E), BTI agreed that:

Beep shall have the: (i) Right of First Refusal during the Term to each Holon Mover produced at the Assembly Site or otherwise for use in the Territory to the extent that Beep has provided Benteler with a Binding Production Commitment at least twelve (12) months prior to production of the Holon Mover at the Assembly Site or otherwise for use in the Territory; and (ii) preferred right to sell to Clients in the Territory, either directly or indirectly through Benteler (or any Affiliate of Benteler and/or any member of the CAB Group), the Initial Beep Quota from the date of this Agreement up to the expiry of the Interim Term, subject to Beep Excused Performance.

63.     Further in Section 3(E), Benteler agreed that:

[e]xcept as otherwise permitted under this Agreement and as set forth in Section 5(C), Benteler shall not, during the Initial Term, propose, either directly or indirectly, any Holon Movers for sale or lease in the Territory independently of Beep, including the Beep Software and Managed Services.

64.     Section 1 defines the "Territory" as the United States, including its territories.

65.     In Section 12 (D) of the Alliance Agreement, BTI agreed that if: (i) BTI failed to procure the performance by Holon US of one or more of the undertakings set forth in Sections 3(A), 3(B), 3(C), 3(D)(1) or 3 (F), or (ii) Holon US failed to timely perform one or more of the undertakings set forth in those same Sections (in each case, such failure is defined as an "Undertaking Breach"), BTI shall pay Beep the liquidated damages in an amount equal to the Agreed Cap.

66.     The amount of the Agreed Cap was equal to the Alliance Fee of $30 million, minus certain fees if those fees previously were paid to Beep under the Alliance Agreement.

67.     Beep has received no fees to date under the Alliance Agreement.

68.     Following execution of the Alliance Agreement, Beep has continued to develop a sales pipeline for the Holon Movers in the United States.

69.     Beep's extensive efforts to engage with its customers have been complicated by BTI's failure to make available the financing options to customers, as required by the Alliance Agreement.

70.     Notwithstanding BTI's failure to pull its own weight, Beep has been able to secure several orders and refundable deposits from clients for the future delivery of Holon Movers.

71.     For example, Beep was able to close a procurement deal with the State of Florida for the purchase of Holon Movers to be used by state and local governments and transportation authorities.

72.     To date, Holon US has not been able to manufacture the Holon Movers required to fill those orders and there is no hope that manufacturing deadlines set forth in the Alliance Agreement will be met.

### 3. *The CAB Guarantee Agreement*

73. On or about August 22, 2024, Beep entered into a Guarantee Agreement with CAB wherein CAB guaranteed BTI's obligation to pay liquidated damages as a result of an Undertaking Breach (BTI's "Obligations") of the Alliance Agreement.

74. Section 2.1(b) of the Guarantee Agreement provides:

> If and whenever Benteler is in default of the payment when due of any Obligations in accordance with the terms of the Alliance Agreement and has not cured such default in accordance with the time period set forth therein, the Guarantor will within ten (10) Business Days after being given notice to that effect by the Beneficiary, pay all such amounts then payable by Benteler pursuant to the terms of the Alliance Agreement as though the Guarantor instead of Benteler was expressed to be the principal debtor.

75. Section 2.4(f) of the Guarantee Agreement provides:

> To the fullest extent permitted by applicable law, the Guarantor waives any defense based on or arising out of any defense of Benteler or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Benteler, other than the final and indefeasible payment in full in cash of the Obligations.

### C. BTI's Numerous Breaches of the Alliance Agreement and Attempts to Directly Compete with Beep

### 1. *BTI's Breach Concerning its Corporate Power and Authority*

76. In Section 13(A) of the Alliance Agreement, BTI represented that it had all the requisite corporate power and authority to carry on its business as contemplated in the Alliance Agreement and that no further consent, approval or authorization is required, and all requisite consents had been obtained prior to execution of the Alliance Agreement.

77. Upon information and belief, this representation was false.

78. BTI also represented in the Alliance Agreement that its agreement with Holon US required Holon to satisfy the obligations set forth in the Alliance Agreement.

79. Upon information and belief, this representation was false.

80. Upon information and belief, as of the date of the Alliance Agreement, BTI had not entered into the Holon Agreement with Holon US, and, to this date, BTI and Holon US have still not entered into the Holon Agreement referenced in the Alliance Agreement.

81. BTI represented to Beep that it had the authority to bind Holon US to perform as required under the Alliance Agreement.

82. Upon information and belief, this representation was false.

83. Upon information belief, Holon US was no longer fully controlled by Benteler Group when the Alliance Agreement was signed on August 22, 2024.

84. Rather, upon information and belief, Benteler Group sold 37.9% of HOLON Group, the parent company of Holon US, to the Saudi-controlled Tasaru for USD $250 million on or about July 31, 2024.

85. Upon information and belief, the Benteler Group relinquished absolute control of Holon US as part of this transaction because Tasaru's consent was now required before BTI could meet its obligations under the Alliance Agreement.

86. Casper and the Defendants intentionally concealed these material facts from Beep before the Alliance Agreement was signed.

### 2. BTI's Breach in Failing to Purchase or Lease an Assembly Site in the US

87. In Section 3(B) of the Alliance Agreement, BTI represented that:

(a) Holon has, as of August 8, 2024, agreed to locate a manufacturing facility for the Holon Mover in Jacksonville, Florida (the "Assembly Site") and shall no later than November 8, 2024 purchase or lease land or purchase or lease an existing manufacturing plant including to commence procurement of requisite manufacturing equipment, for the development of the manufacturing facility); and (b) Holon has agreed to achieve SOP of Holon Movers at the Assembly Site, (i) on or prior to October 1, 2026 and/or (ii) including FMVSS compliance and testing, on or prior to February 28, 2027 ("FMVSS SOP"), unless, in each case, the delay is due to a Benteler Excused Performance.

88.     As of November 8, 2024, Holon US had not purchased or leased land or purchased or leased an existing manufacturing plant for the Assembly Site.

89.     Section 2(F) of the Alliance Agreement provides that "[e]ach Party shall promptly notify the other Party in the event of, as applicable, a Benteler Excused Performance or a Beep Excused Performance."

90.     As of November 8, 2024, BTI had never notified Beep that the failure to purchase or lease land for the Assembly Site was caused by a "Benteler Excused Performance."

91.     Even today, Holon US still has not purchased or leased any land or purchased or leased an existing manufacturing plant for the Assembly Site in the United States.

92.     In a letter dated February 2, 2025, Beep notified BTI that it was in breach of Section 3(B) of the Alliance Agreement due to Holon US's failure to purchase or lease land for the Assembly Site.

93.     In that same letter, pursuant to Section 16(B) of the Agreement, Beep requested that the dispute be submitted to the executive management teams of Beep and BTI for resolution.

94.     In an email dated March 3, 2024, BTI informed Beep that "due to macroeconomic effects and beyond Holons control, Holon has postponed the planned SOP [Start of Production] to Q3/Q4 2027."

95.     Section 3(B) of the Alliance Agreement requires that Holon US "achieve SOP of Holon Movers at the Assembly Site" "on or prior to October 1, 2026."

96.     BTI, however, did not identify the macroeconomic effects that were beyond Holon's control—nor were there any known macroeconomic effects that existed that would excuse BTI's performance.

97.    In a letter of March 10, 2025, Beep informed BTI that it had failed to comply with numerous requirements set forth in Section 3(B) of Alliance Agreement.

98.    In a March 26, 2025 letter, BTI claimed that the "Benteler Excused Performance" applied to the failure to purchase or lease an Assembly Site because there were "changes in regulatory circumstances beyond the reasonable control of Benteler, and that Benteler could not reasonably have foreseen, caused Benteler to delay any lease or purchase until after November 2024."

99.    BTI also claimed that the "Benteler Excused Performance" applied to the postponement of the planned SOP to Q3/Q4 2027 because "extensive supply chain impacts to a critical component of the Holon Mover (i.e., the battery supplier's unexpected refusal, after more than two years of negotiations, to provide a battery for the Movers) due to macroeconomic changes in the EV market that are beyond Holon's control and that Holon could not have reasonably foreseen."

100.    In a March 31, 2025 letter, Beep challenged these positions, writing that it was unaware of any changes in the EV market in the seven months between signing the Agreement and the March 3rd email that would have delayed the purchase or lease of an Assembly Site or caused a year long delay in the SOP and that BTI has identified none.  Beep wrote that it appeared that BTI's failure to meet the milestones was not due to anything outside of its own control.

101.    In an April 3, 2025 letter, BTI wrote that "it had appropriately invoked the excused performance exception," Yet BTI failed to provide any explanation or evidence to support its self-serving claim that it was not responsible for its own failures and breaches of the Alliance Agreement.

102.    To date, BTI has neither cured any of its breaches nor paid Beep what it is owed.

### 3.    *BTI's Breach by Proposing Sales of Holon Movers Independently of Beep*

103.    Under the Alliance Agreement, the parties specifically stated their purpose as their "desire to enter into this Agreement, which shall, ***inter alia***, grant Beep the right to market, operate and provide managed services for the Holon Movers to Prospective Clients and Clients in the Territory [the United States]."[2]  (emphasis in original).

104.    Toward that end, BTI granted Beep the "preferred right to sell to Clients in the Territory."  (*Id.* § 3(E).) In turn, BTI promised that it would "not propose, either directly or indirectly, any Holon Movers for sale or lease in the United States independently of Beep, including the Beep Software and Managed Services."  (*Id.* § 3(E)

105.    Rather, Beep and BTI agreed to "cooperate for all opportunities with Prospective Clients in the Territory."  *Id.*

106.    In Section 5 of the Alliance Agreement, BTI and Beep agreed to share with the other "all initial leads of Prospective Clients in the Territory and each Party shall, through the submission of a Lead Registration Form, register with the other Party opportunities with Prospective Clients."  (*Id.* § 5(C).)  Regardless of whether they submitted a Lead Registration Form, they agreed that "[n]either Party shall submit competitive bids to any Prospective Client of the other Party."  *Id.*

107.    As part of their commitment to cooperate with one another, Beep and BTI agreed to "hold weekly sales meetings consistent with the Governance Framework process to jointly evaluate Prospective Clients, Lead Registration Forms, manage sales activities and monitor the

---

[2] A "Client" is defined as a "Prospective Client that has executed a Client Agreement."  (*Id.* § 1.)  A "Client Agreement" included " agreement(s) for: (i) the sale or lease of one or more Holon Movers; (ii) the provision of TaaS Services; and/or (iii) Managed Services and/or Beep Software."  (*Id.*)  A "Prospective Client" is defined as a " a prospective customer of the Holon Mover located in the Territory and identified in accordance with the Governance Framework."  (*Id.*)

Beep Quota and agreed upon KPIs." *Id.* They agreed to provide monthly "update[s] as to status of its Prospective Clients." *Id.*

108.    And, most importantly, BTI agreed that it "shall not during the Term propose to a Prospective Client, or otherwise provide to a Client, in the Territory, either directly or indirectly, any services or software similar to or competitive with the Managed Services or Beep Software independently of Beep." *Id.*

109.    As a result of these representations, Beep expended considerable resources that benefitted Casper, the Defendants and Holon US by leading the project through the United States regulatory process, advancing the effort to obtain necessary approvals, and introducing BTI and Holon US to key industry contacts, trade associations, Members of Congress, DOT officials and state legislators.

110.    Beep also provided BTI with confidential information concerning Prospective Clients, existing Clients, the Beep software, its regulatory strategies, service descriptions and other confidential sales and marketing materials.

111.    As the normal regulatory process gained traction, BTI missed milestones that had nothing to do with the regulatory process, such as failing to lease space to manufacture in the United States.

112.    Upon information and belief, BTI's failure to do so was either an intentional part of the Defendants' scheme or due to Casper's inability to resolve his family squabbles and/or liquidity problems.

113.    As final regulatory approvals are in reach, Casper and BTI decided that they can profit from the United States market on their own now that Beep has provided the $30 million

investment, established a United States market and brought the regulatory approval process to a promising position.

114.    With Beep cast to the side, BTI and Holon US are, upon information and belief, now contacting Beep's Clients, Prospective Clients, and making deals without Beep in violation of the Alliance Agreement.

115.    In particular, Beep has been informed by contacts in the industry that Casper and BTI have excluded Beep from efforts to sell and deliver Holon Movers. For example, it was publicly announced that BTI has partnered with Lyft to deploy Holon Movers in the United States independently of Beep beginning in 2026.[3]  BTI, of course, did not inform Beep of its partnership with Lyft prior to making the public announcement.

116.    As it plans to move forward without Beep, BTI has removed references to Beep from its marketing materials.

117.    The active engagement of BTI in pursuing direct sales of the Holon Movers to Beep's current and Prospective Clients and others in the United States is a breach of the Alliance Agreement, has created confusion in the marketplace, and has materially impacted Beep's revenue by disrupting potential sales of the Holon Movers.  These actions are causing Beep irreparable, reputational, and other harm.

118.    Despite BTI's scheme, Beep has secured more than $2 million in pre-orders for Holon Movers. Given BTI's failure to hit its milestones under the Alliance Agreement, Beep may be forced to return the deposits if the Holon Movers are not available for timely delivery.

---

[3] https://www.lyft.com/blog/posts/lyft-and-benteler-mobility-to-introduce-next-generation-autonomous-shuttles-across-lyft-network.

119.    On March 10, 2025, Beep notified BTI that it was breaching the Alliance Agreement by directly contacting current and Prospective Clients of Beep - independently of Beep - for the purpose of selling or leasing the Holon Movers, in violation of Section 3(E).

120.    In response, on March 26, 2025, BTI did not deny that it was contacting Beep's Prospective Clients or cutting it out of sales.

121.    Instead, it claimed that it could do so as long as it included Beep's Software and Managed Services with the sales.

122.    In a March 31, 2025 letter, Beep informed BTI that its interpretation directly contradicted both the plain language of the Alliance Agreement and all prior representations made by Casper and the Defendants.

123.    Specifically, Section 3(E) prohibits BTI from inserting itself in the sales process for Holon Movers within the Territory. The last clause of the prohibition – "including Beep software and managed services" – is inclusive of the prohibition, not a carve out from the prohibition.

124.    In its April 3, 2025 letter, BTI refused to cure its breaches or pay Beep the Agreed Cap.

### 4.    *BTI's Breach by Failing to Timely Deliver the Initial Production Test Holon Movers*

125.    In Section 3(A) of the Alliance Agreement, BTI represented that Holon US "committed to develop the Holon Mover and meet the applicable Availability Dates for the PT1, PT2 and PT0" prototypes of the Holon Movers "unless the delay is due to a Benteler Excused Performance."  BTI also represented that Holon US would deliver the prototypes on the applicable Availability Dates.  The Availability Date for the two (2) PT1 Holon Movers in the Alliance Agreement was May 31, 2025.

22

126.    The two (2) PT1 prototypes were not delivered by May 31, 2025, and have still not been delivered. BTI has not provided a Benteler Excused Performance for the failure to timely deliver the prototypes.

### 5. CAB Breaches the Guarantee

127.    In an August 18, 2025, letter, Beep notified CAB that BTI was in default of the Obligations and Beep demanded payment of the Agreed Cap in accordance with the terms of the Guarantee.

128.    CAB ignored the August 18, 2025, letter and has yet to pay the amounts due under the Guarantee.

### 6. Defendants Refused to Resolve the Dispute

129.    Over nine months, Beep has made every possible effort to resolve its dispute with the Defendants.  Casper and the Defendants, however, offered no logical explanation for their actions and have refused to cure any of their many breaches.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (As against BTI under the Alliance Agreement)

130.    Beep repeats and realleges each and every allegation above as if set forth fully in this cause of action.

131.    The Alliance Agreement is a valid and enforceable contract.

132.    Beep has fully performed under the Alliance Agreement.

133.    BTI has breached the Alliance Agreement by, among other things:

a.    Misrepresenting that BTI had the authority to bind Holon US under Section 13(A) of the Alliance Agreement;

b.    Failing to seek from Holon US the commitments and consents required of Holon US in the Alliance Agreement;

23

c.  Failing to secure Holon US's performance to make available two test Holon Movers to Beep by May 31, 2025, as required by Section 3(A);

d.  Failing to secure Holon US's performance to procure a site for the manufacture of Holon Movers as required by Section 3(B);

e.  Failing to secure Holon US's performance to commit to Start of Production (SOP) by October 1, 2026, as required by Section 3(B); and

f.  Contacting Beep's Prospective Clients for the purpose of selling or leasing Holon Movers independently of Beep in violation of Section 3(E).

134.  BTI's failure to perform any one of the obligations required under Section 3(A) or 3(B) set forth above constitutes an Undertaking Breach under Section 12(D) of the Alliance Agreement.

135.  As a direct result of BTI's breaches, Beep has suffered damages in excess of $30 million.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
#### (As against CAB under the Guarantee)

136.  Beep repeats and realleges each and every allegation above as if set forth fully in this cause of action.

137.  The Guarantee Agreement is a valid and enforceable contract.

138.  Beep has fully performed under the Guarantee.

139.  Section 2.1(b) of the Guarantee Agreement provides:

If and whenever [BTI] is in default of the payment when due of any Obligations in accordance with the terms of the Alliance Agreement and has not cured such default in accordance with the time period set forth therein, the Guarantor will within ten (10) Business Days after being given notice to that effect by the Beneficiary, pay all such amounts then payable by [BTI] pursuant to the terms of the Alliance Agreement as though the Guarantor instead of [BTI] was expressed to be the principal debtor.

140.     BTI is in default of the Alliance Agreement and its obligation to repay the $30 million.

141.     CAB is therefore obligated to pay Beep no less than $30 million.

142.     CAB has defaulted on its Obligations under the Guarantee Agreement.

143.     As a direct result of CAB's breach, Beep has suffered damages in the amount of no less than $30 million.

**THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(As against BTI)**

144.     Beep repeats and realleges each and every allegation above as if set forth fully in this cause of action.

145.     On August 22, 2024, Beep and BTI duly executed the Alliance Agreement.

146.     Beep agreed to provide $30 million in consideration for the Alliance Agreement.

147.     Beep reasonably understood that the Alliance Agreement imposes on BTI an implied covenant of good faith and fair dealing to use Beep's $30 million investment to establish and develop Holon US's business in the United States.

148.     Upon information and belief, BTI has breached the covenant of good faith and fair dealing by failing to use Beep's $30 million investment to establish and develop Holon US's business in the United States,

149.     Upon information and information, BTI has further breached the covenant of good faith and fair dealing by using Beep's $30 million investment for purposes unrelated to the Holon US business.

150.     Beep has been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Beep respectfully requests judgment as follows:

A.  Awarding Beep compensatory, punitive and other damages in excess of $30 million;

B.  Awarding Beep attorneys' fees, costs and interest; and,

C.  Awarding Beep such further relief as the Court deems just and proper under the circumstances.

Dated: September 15, 2025                          By:  */s/ Michael D. Hynes*

**DLA PIPER LLP (US)**

Michael D. Hynes
Marc A. Silverman
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4500
michael.hynes@us.dlapiper.com
marc.silverman@us.dlapiper.com

Benjamin Boyd (pro hac vice forthcoming)
Benjamin Gersch (pro hac vice forthcoming)
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4000
benjamin.boyd@us.dlapiper.com
benjamin.gersch@us.dlapiper.com

*Attorneys for Plaintiff Beep, Inc.*